IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SILVER POINT FINANCE LLC, | § § | |
| Plaintiff, | § § | |
| v. | § § | 3:09-CV-669-P |
| CHESAPEAKE EXPLORATION, L.L.C., | § § § | |
| Defendant. | § | |

## ORDER

Now before the Court is Plaintiff Silver Point Finance LLC's ("SilverPoint") Motion for Partial Summary Judgment, filed on January 31, 2011. Defendant Chesapeake Exploration, L.L.C. ("Chesapeake), filed a Response on February 21, 2011. After reviewing the parties' briefing, the evidence, and the applicable law, the Court DENIES Plaintiff's Motion for Partial Summary Judgment.

### I.   Background

Silver Point Finance LLC ("SilverPoint") is the successor-in-interest to Paz Energy LLC ("Paz"). It is a non-operating, working interest owner of oil and gas rights under a joint operating agreement (the "Operating Agreement") naming Chesapeake operator in connection with an oil and gas lease at DFW airport (the "Lease"). SilverPoint and Chesapeake entered into the Operating Agreement on or around September 6, 2006, and subsequently amended that agreement effective February 23, 2007. Chesapeake entered into an agency agreement with Chesapeake Energy Marketing, Inc. ("CEMI") assigning the right to market the gas produced from the Lease to CEMI. (Def.'s Resp. Br. 3.) CEMI sells the gas production from the Lease to Louis Dreyfus Energy Services ("LDES") and pursuant to that purchase agreement, no post-

production expenses are charged or deducted by LDES. (Pl.'s Mot. Br. 3; Def.'s Resp. Br. 3-4.) Chesapeake has charged SilverPoint production expenses in excess of $3.5 million for gathering and marketing. The parties dispute whether the Operating Agreement authorizes these charges.

## II. Legal Standard & Analysis

### A. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine dispute for trial and of identifying those portions of the record that demonstrate such absence. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(a) (2010) (replacing "issue" with "dispute"). However, all evidence and reasonable inferences to be drawn there from must be viewed in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact dispute. Fed. R. Civ. P. 56(e) (2010); Fed. R. Civ. P. 56(a) (2010) (replacing "issue" with "dispute"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The party defending against the motion for summary judgment cannot defeat the motion, unless he provides specific facts demonstrating a genuine dispute of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will

not prevent summary judgment. *See id.* at 249–50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Further, a court has no duty to search the record for evidence of genuine issues. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

Summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56. *Jensen v. Snellings*, 841 F.2d 600, 618 (5th Cir. 1988); *British Caledonian Airways Ltd. V. First State Bank of Bedford, Texas*, 819 F.2d 593, 595 (5th Cir. 1987); *Landry v. G.B.A.*, 762 F.2d 462, 464 (5th Cir. 1985). Where the nonmoving party is entitled to judgment, "great care must be exercised to assure that the original movant has an adequate opportunity to show that there is a genuine issue and the opponent is not entitled to judgment as a matter of law." 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE CIVIL §2720 (3d ed. 2010).

### B. Interpretation of the Oil and Gas Lease

In construing an unambiguous oil and gas lease, our task is to ascertain the parties' intentions as expressed in the lease. *Heritage Res. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727-28 (Tex.1981)). "To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Id.* at 121 (citing *Steeger v. Beard Drilling Inc.*, 371 S.W.2d 684, 688 (Tex.1963)). "We presume that the parties to a contract intend every clause to have some effect." *Id.* (citing *Ogden v. Dickinson State Bank*,

662 S.W.2d 330, 331 (Tex.1983)). "We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Id.* (citing *Western Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953)). We will enforce an unambiguous document as written. *Id.* (citing *Sun Oil Co.*, 626 S.W.2d at 728).

The two contract provisions cited by the parties in support of their respective positions are Article VI.C of the Operating Agreement (Pl.'s App. 21) and Paragraph 5 of the Marketing Letter (Pl.'s App. 55). Article VI.C incorporates the "operator's standard marketing letter agreement" thereby incorporating the Marketing Letter. Article VI.C also incorporates the "industry standard" for "reasonable fees associated with [the] marketing efforts." (Pl.'s App. 21.) In addition to incorporating by reference the Marketing Letter and the industry standard for marketing charges, Article VI.C sets out that "[e]ach party shall take in kind or separately dispose of its proportionate share of oil and gas" and further provides that "any extra expenditure incurred in taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party." (*Id.*) The Operating Agreement further provides that Chesapeake is obligated to purchase and sell the produced oil and gas from the Lease should SilverPoint not make arrangements to take in kind or separately dispose of its proportionate share. *See El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W. 3d 616, 625-26 (Tex. App. Houston [1st Dist.] 2003, ) (finding no legal duty on the part of the operator to market the gas where the contract stated that the operator shall have the right but not the obligation to purchase or sell oil and gas of the non-taking party).

Chesapeake contends and SilverPoint does not refute that Chesapeake marketed and sold the oil and gas from the lease to LDES because SilverPoint failed to make arrangements to take

its share of production in kind and is instead relying upon Chesapeake to sell its share. (Def.'s Resp. 5.) Thus, SilverPoint is obliged to bear the proportionate share of the fees to market its share of oil and gas in accord with the plain terms of the Operating Agreement.

However, SilverPoint argues that because Chesapeake's purchase agreement through CEMI does not provide for the charge or deduction of post-production expenses to LDES, SilverPoint is not obligated to pay the marketing and gathering fees charged to it by Chesapeake. SilverPoint bases its argument on Paragraph 5 of the Marketing Letter and contends that the phrase "expenses charged or deducted by the purchasers of production" limits or qualifies its obligation to pay its proportionate share of post-production expenses. Such an interpretation is inconsistent with the general rule that even though royalty is not subject to the costs of production, it is usually subject to post-production costs, including taxes, treatment costs to render the oil and gas marketable, and transportation costs. *Martin v. Glass*, 571 F.Supp. 1406, 1410 (N.D.Tex.1983); *Heritage Res.*, 939 S.W.2d at 122. While the parties are allowed to contract around that general rule, here it is clear that they have not done so. Rather, the Court reads the phrase in context with the rest of the terms in Paragraph 5 and the Article VI.C provisions specifying SilverPoint's obligation to pay proportionate post-production expenses and Chesapeake's obligation to purchase or sell oil or gas not taken by SilverPoint. *See American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) (stating that the court must read a contract as a whole, giving effect to each provision so as not to render other provisions meaningless). Here, the phrase "expenses charged or deducted by the purchasers of production" is not meant to absolve SilverPoint of its obligation to pay its share of post-production expenses where such an interpretation would make the terms of Article VI.C of the Operating Agreement meaningless.

Instead the phrase "expenses charged or deducted by the purchasers of production" is meant to describe the general circumstance where Chesapeake sells the oil and gas to "purchasers of production," and the purchaser charges or deducts expenses. Where, as here, purchasers do not charge expenses, pursuant to the JOA SilverPoint is still responsible for all reasonable fees associated with Chesapeake's marketing efforts consistent with industry standards.

SilverPoint also directs the Court to the Article VI.C provision that incorporates the industry standard. Article VI.C does not explicitly refer to the COPAS Bulletin. However, Chesapeake provides evidence which indicates that the COPAS Bulletin is wholly inapplicable to marketing and gathering fees. (Def.'s Resp. 10-11.) SilverPoint cites to the COPAS bulletin for the proposition that marketing fees are considered part of the operator's indirect, overhead costs, and are paid by the non-operators as part of the agreed overhead rate unless specifically specified as direct costs. However, Chesapeake presents evidence that the COPAS Model Form Interpretation is referring to general marketing as a function of an entity's general administrative functions such as the type of general administrative overhead costs that any business entity would have, e.g., planning, purchasing, accounting, marketing, etc. The marketing fees charged to SilverPoint reflect the post-production costs to render the oil or gas produced marketable. *See Martin v. Glass*, 571 F. Supp 1406, 1411-1412 (D.C. Tex. 1983) ("Costs incurred prior to production are to be borne by the operator, while costs incurred subsequent to production (those necessary to render the gas marketable) are to be borne on a pro rata basis between operating and nonoperating interests.") Thus, even if the COPAS bulletin was found to be relevant to this dispute, the provision cited by SilverPoint specifically addresses general marketing costs and not

post-production marketing fees incurred to render the gas marketable. As such, it is inapplicable to the terms in this dispute.

### III.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

Signed this 22nd day of April, 2011.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE